**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Gerald SALAZAR, Defendant–Appellant.**

No. 91–5632.

United States Court of Appeals,
Fifth Circuit.

May 1, 1992.

Philip J. Lynch, R. Clark Adams, Asst. Federal Public Defenders, Lucien B. Campbell, Federal Public Defender, San Antonio, Tex., for Gerald Salazar.

Michael W. McCrum, Asst. U.S. Atty., Richard L. Durbin, Jr., Ronald F. Ederer, U.S. Attys., San Antonio, Tex., for U.S.

Before POLITZ, Chief Judge, REYNALDO G. GARZA and WIENER, Circuit Judges.

POLITZ, Chief Judge:

Gerald Salazar pled guilty to attempting to manufacture in excess of 100 grams of methamphetamine in violation of 21 U.S.C. § 846 and was sentenced to 84 months imprisonment and a five-year term of supervised release. He appeals his sentence. Concluding that the error of which he complains does not result in the relief he seeks, and that his sentence is supported by the record, we affirm.

### Background

During October 1990 Drug Enforcement Administration agents received information from a reliable informant that Salazar was involved in the manufacture of methamphetamine. On October 28, 1990 agents observed him carrying a vacuum pump, several chemical bottles, boxes, and other items into a house in New Berlin, Texas. The agents detected a strong chemical odor which they associated with the manufacture of methamphetamine. They obtained a search warrant and in their search of the house discovered an active methamphetamine laboratory, finding approximately 1700 milliliters of phenylacetic acid, 454 grams of powdered phenylacetic acid, over 10 ounces of phenylacetone, and various other items needed for the manufacture of methamphetamine. The agents estimated that the chemicals were sufficient to manufacture over 100 grams of methamphetamine. Salazar was the only person on the premises.

Salazar entered into a plea agreement and, as above noted, pled guilty to attempting to manufacture in excess of 100 grams of methamphetamine. The plea agreement provided that the maximum period of incarceration Salazar would receive would be seven years or the top of the applicable sentencing guideline range, whichever was the lesser. The probation officer used the Drug Equivalency Tables in U.S.S.G. § 2D1.1(c) and computed that a total of 475.696 grams of methamphetamine was involved. This led to a base offense level of 28 which, with Salazar's criminal history category of I, resulted in a guideline incarceration range of 78 to 97 months.

At the sentencing hearing Salazar objected to the calculation of his offense level and offered the expert testimony of Dr. Ben Plummer as to the quantity of methamphetamine involved. The district court adopted as its findings the facts recited in the presentence report, found a guideline sentencing range of 78 to 97 months, honored the plea bargain maximum and sen-

tenced Salazar to prison for 84 months. He timely appealed.

## Analysis

Salazar maintains that the district court erred when it utilized the Drug Equivalency Tables in calculating the quantity of drugs to be used in the computation of his base offense level. We accept the district court's findings of fact unless clearly erroneous, but review the legal application of the guidelines *de novo*. *United States v. Hooten*, 942 F.2d 878 (5th Cir.1991). Doing this, we find that Salazar's challenge has merit.

The probation officer and, by adoption, the court used the Drug Equivalency Tables of the guidelines in quantifying the amount of methamphetamine extant in the violation at bar. We agree with our colleagues of the Fourth Circuit and hold that this use of the Drug Equivalency Tables was error. In *United States v. Paz*, 927 F.2d 176 (4th Cir.1991), a panel including the chairman of the United States Sentencing Commission, stated as follows:

> [T]he Drug Equivalency Tables contained in note 10 of the commentary to § 2D1.1 are not manufacturing conversion ratios intended to reflect the amount of controlled substance that can be manufactured from an ingredient substance, such as the amount of crack that can be manufactured from a given amount of cocaine. Rather, the Drug Equivalency Tables "provide a means for combining differing controlled substances to obtain a single offense level."

927 F.2d at 180. The court held that because Paz was convicted of conspiring to manufacture only one controlled substance the Drug Equivalency Tables had no application.

The guideline commentary to the Drug Equivalency Tables states that the tables are to be used (1) when the controlled substance involved in the offense is not listed in the Drug Quantity Table, or (2) to obtain an equivalent when a defendant possesses more than one type of controlled substance. U.S.S.G. § 2D1.1, comment. n. 10.[1] In the case at bar the controlled substance involved in the offense, methamphetamine, is listed in the Drug Quantity Table. The district court erred in using the Equivalency Tables.

This misapplication of the guidelines, however, does not mandate a remand for resentencing. Under the controlling facts of this case, on remand the identical sentence of incarceration would have to be imposed and, therefore, a remand is not required. *Williams v. United States*, ─── U.S. ───, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992).

Using the undisputed facts recited in the presentence report, which were accepted by the district court, and the testimony of defendant's expert witness we find the following: Under Dr. Plummer's most conservative analysis, there would be a conversion ratio of 44% for the phenylacetic acid to phenylacetone. Applying this ratio to the 454 grams of powdered and 1700 milliliters[2] of liquid phenylacetic acid results in 948 grams of phenylacetone. Adding this to the phenylacetone seized[3] results in a total of 1254 grams of same. According to Dr. Plummer and the government's most conservative estimate, the ratio of phenylacetone to methamphetamine is 50%; therefore, this quantity of phenylacetone would

---

**1.** When reviewing the guidelines we should consider the commentary and attempt to construe the guidelines in an internally consistent manner. *United States v. Anderson*, 942 F.2d 606 (9th Cir.1991) (en banc).

**2.** "Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." U.S.S.G. § 2D1.1 n.* (1990); *see also United States v. McKeever*, 906 F.2d 129

(5th Cir.1990), *cert. denied*, ─── U.S. ───, 111 S.Ct. 790, 112 L.Ed.2d 852 (1991); *United States v. Dorrough*, 927 F.2d 498 (10th Cir.1991); and *United States v. Garcia*, 925 F.2d 170 (7th Cir.).

**3.** Approximately ten ounces of one fluid contained phenylacetone and ten milliliters of another fluid contained phenylacetone. One fluid ounce is 29.6 milliliters, therefore, the combined total of the fluids containing phenylacetone was 306 milliliters.

convert to at least 627 grams of methamphetamine.

The base offense level for 627 grams of methamphetamine is 28, serendipitously identical to the offense level resulting from the inappropriate utilization of the Drug Equivalency Tables, if indeed the trial judge used those tables. The government vigorously argues that the presentence report computes the quantity of drugs by use of the Drug Equivalency Tables and by mathematical computation. Which approach the district court accepted may be a bit uncertain from the trial court's ruling. We conclude, however, that the more likely basis for the court's quantity computation is the Drug Equivalency Tables. Regardless, for the reasons we have assigned, both approaches lead to an offense level of 28. The guideline range for that level and the operative plea bargain minimum sentence necessarily lead us, then, to a term of imprisonment for 84 months.

The sentence imposed is AFFIRMED.