**UNITED STATES of America, Appellee,**

v.

**Michael D. JOHNSON, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Kevin Lamont THOMAS, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Dwayne Antonio THOMAS, Appellant.**

**Nos. 92–3276, 92–3289 and 92–3153.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 11, 1994.

Decided Nov. 22, 1994.

Jensen E. Barber, Washington, DC (appointed by the court), argued the cause and filed the brief, for appellant Michael D. Johnson. A.J. Kramer, Federal Public Defender, and Carmen D. Hernandez, Asst. Federal Public Defender, Washington, DC, filed the briefs, for appellant Kevin Lamont Thomas.

A.J. Kramer, Federal Public Defender, Washington, DC, argued the cause, for appellant Dwayne Antonio Thomas. With him on the briefs was Carmen D. Hernandez, Asst. Federal Public Defender, Washington, DC.

Barbara A. Grewe, Asst. U.S. Atty., Washington, DC, argued the cause, for appellee. With her on the brief were Eric H. Holder, Jr., U.S. Atty., John R. Fisher, Roy W. McLeese, III, and William R. Cowden, Asst. U.S. Attys., Washington, DC.

Before: EDWARDS, Chief Judge, SILBERMAN and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

These cases involve a constitutional challenge to the Anti–Drug Abuse Act of 1986 ("1986 Act"), which punishes crimes involving "crack" cocaine more severely than those involving an equivalent amount of cocaine powder. Appellants were convicted of possession and distribution of crack cocaine, sentenced under the federal Sentencing Guidelines, and now appeal their sentences under the equal protection component of the Fifth Amendment's Due Process Clause. We affirm the convictions and sentences.

## I.

This opinion responds to the common contentions of appellants Dwayne Antonio Thomas, Kevin Lamont Thomas, and Michael D. Johnson, raised in three separate appeals. Each appellant was convicted of an offense or offenses involving crack cocaine, and sentenced accordingly under the federal Sentencing Guidelines.

Dwayne Antonio Thomas was apprehended within 1000 feet of a school in possession of 16.26 grams of cocaine base, 0.429 grams of marijuana, $190 in cash and a beeper. He was subsequently indicted for possession with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. § 841(a), possession with intent to distribute a controlled substance within 1000 feet of a school in violation of 21 U.S.C. § 860(a), and unlawful possession of marijuana in violation of 21 U.S.C. § 844(a). He pleaded guilty to possession with intent to distribute cocaine base within 1000 feet of a school, and the other counts were dismissed. Applying the federal Sentencing Guidelines, the trial court arrived at a sentence of 87 months' imprisonment, the bottom of the applicable guideline range.

Michael D. Johnson was apprehended on March 12, 1992, while the passenger in a car driven by appellant Kevin Lamont Thomas. Officers observed Johnson placing something under his seat during the traffic stop; that something was ultimately determined to be a plastic bag containing 52.98 grams of crack cocaine. Both appellants were charged with possession with intent to distribute 50 grams or more of cocaine base and possession with intent to distribute 50 grams or more of cocaine base within 1000 feet of a school. Thomas pleaded guilty to the latter charge and was sentenced to 121 months' imprisonment followed by 10 years' supervised release.

Johnson proceeded to trial on both counts. Evidence was introduced at trial relevant to Johnson's possession with intent to distribute that on March 10, 1992, two days prior to Johnson's ultimate arrest, police apprehended Johnson while he was showing an object to two females, an object which he discarded upon arrival of the police and which turned out to be a 3.5 gram "rock" of crack cocaine. Johnson was convicted of possession with intent to distribute cocaine base, though he was acquitted of intent to distribute within 1000 feet of a school. He was sentenced to 121 months' imprisonment to be followed by five years' supervised release.

All three appellants, African–Americans, raise identical constitutional challenges to the 1986 Act and the federal Sentencing Guidelines, alleging that the sentencing scheme violates the equal protection component of the Fifth Amendment by disproportionately and invidiously impacting blacks through meting out of harsher penalties for offenses involving crack cocaine—as opposed to sentences received by offenders possessing identical amounts of powder cocaine. "Crack" cocaine is also known as cocaine base, and is trafficked and sold in a hard, rock-like form. Cocaine powder or cocaine hydrochloride is sold in a loose granular form. Cocaine powder may be reduced to cocaine base through a baking or distillation process. In fiscal year 1992, 91.5% of defendants convicted nationwide in federal crack cocaine prosecutions were black, 5.3% were hispanic, and 3% were white. In the same time period, slightly more than 25% of defendants convicted of federal cocaine powder offenses were black, while over 30% were white.

Under the penalty structure of the 1986 Act, 21 U.S.C. § 841(b), one gram of crack cocaine is equivalent to 100 grams of cocaine powder. This ratio translates into disparate penalties. For example, an offense involving five grams or more of crack cocaine triggers a mandatory minimum five-year prison term, while an offense involving a similar amount of powder cocaine does not. 21 U.S.C. § 841(b)(1)(B)(iii). Appellants argue that Congress (and the Sentencing Commission) acted with a discriminatory motive in choosing to punish crack offenders more severely than criminals trafficking in cocaine powder.

## II.

■ We have only recently rebuffed a challenge to the same statute challenged by appellant here on Fifth Amendment due process and equal protection grounds. *United States v. Thompson,* 27 F.3d 671 (D.C.Cir. 1994). But in *Thompson* the appellant had asserted only that the statutory scheme failed the rational basis test—the lowest level of judicial review of government action challenged on equal protection grounds. In the present cases the appellants alternatively argue that the appropriate scope of judicial inquiry is greater than the deferential rational basis review; it is claimed that we must exercise "strict scrutiny." If that standard governed, we would be obliged to ask, in accordance with reigning constitutional doctrine, whether the statute is narrowly tailored to serve a compelling state interest.

■ In order to trigger strict scrutiny, however, appellants must show more than that the sentencing scheme has a disproportionate impact on those African–Americans who are convicted of cocaine-related offenses.[1] The Supreme Court has required that a "decisionmaker ... selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of,' its adverse effect upon an identifiable group." *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979), *aff'd,* 445 U.S. 901, 100 S.Ct. 1075, 63 L.Ed.2d 317 (1980). Discriminatory purpose thus implies even more than an "awareness of consequences." *Id.*

■ Disparate racial impact, to be sure, can be probative of such purpose, but it is not dispositive without more. *See Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). It is not enough that a law impacts members of different races differently *in effect*—it must have been passed at least in part with that *purpose.* When determining whether such invidious discriminatory purpose exists, courts may look to "the totality of the relevant

---

1. Strict scrutiny is also applied where a statute burdens the exercise of a "fundamental" right, which cannot be properly asserted here, though appellants allude to that rubric of equal protection analysis as their alternative—and misguided—basis for requesting heightened scrutiny. *See, e.g., San Antonio Independent Sch. District v. Rodriguez,* 411 U.S. 1, 33–34, 93 S.Ct. 1278, 1296–97, 36 L.Ed.2d 16, *reh'g denied,* 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973). Appellants' asserted "liberty interests" bear no relation to the fundamental "rights" at stake in cases such as *Rodriguez* (education) and *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) (marriage and procreation), interests which represented more than just the manufactured "right" to be free from the very punishment at issue in the core equal protection challenge.

facts," including the disparate impact. *See id.* at 242, 96 S.Ct. at 2048. Circumstantial evidence of racially discriminatory legislative purpose may also include the historical background of the legislative scheme, the specific sequence of events leading up to the enactment, a departure from the normal *procedural* sequence, a *substantive* departure from a routine decision or rule, contemporary legislators' statements, and the "inevitability or foreseeability of the consequence of the law." *See United States v. Clary,* 34 F.3d 709, 711 (8th Cir.1994) (*citing Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978)).

■ Appellants urge us to ascribe a discriminatory intent to Congress based on rather sketchy and unpersuasive bits of information. They point first to the undeniable racism that animated legislative debate leading to the passage of a *1914* statute criminalizing cocaine trafficking generally, long before the crack/powder distinction was contemplated. We think this information is of no relevance to our inquiry into the motives of the Congress that passed the 1986 Act. *McCleskey v. Kemp,* 481 U.S. 279, 298 n. 20, 107 S.Ct. 1756, 1770 n. 20, 95 L.Ed.2d 262 (1987) ("unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value."). In light of the changes in American society since 1914, changes in no small way effected by successive Congresses,—including the impact of the Voting Rights Act on the nature of Congress itself—it would be anomalous to attempt to tar the present Congress with the racist brush of a pre-World War I debate.

Turning to the 1986 Congress, which passed the legislation appellants challenge, appellants' claim of a discriminatory motive is based only on indications that the statute was passed hastily, without full committee hearings addressing all aspects of the statute, and on the alleged racial imagery contained in a few documents introduced into the Congressional Record and contemporaneous utterances of some legislators. The climate in Congress was allegedly "frenzied,"

as legislators moved to respond to the burgeoning crack epidemic. *See United States v. Walls,* 841 F.Supp. 24, 29 (D.D.C.1994). The 100–1 ratio of severity of treatment of crack versus cocaine powder received attention in one Senate Committee hearing for "only" 3½ hours. Media accounts introduced into the Congressional Record indicated that crack dealers were either African–American or from Caribbean islands, one senator described the dealers as drawn from "the ghetto's legion of unemployed teenagers," and other statements entered into the record characterized the crack problem as "spreading well beyond the inner city" and becoming a "white" problem. *See Walls,* 841 F.Supp. at 28–29.

■ Whether one believes the disparity between crack sentences and cocaine sentences is "fair" or not, *see Walls,* 841 F.Supp. at 29, we think these scattered pieces of legislative history are quite inadequate to serve to attribute a discriminatory purpose to the Congress. Congress' undeniable haste in passing the 1986 Act is more naturally attributed to a very real public concern over the generic elements of the crack phenomenon—an expanding market, the proliferation of violence among dealers and in the larger community, and the untold suffering and degradation of addicts.

■ After all, the Congress of 1986 was composed of many congressmen, including a number of African–Americans, who could have been expected to attack promptly any legislation thought to stem from discriminatory purpose—let alone legislation accompanied by racist remarks. That media accounts introduced into the Congressional Record reflected awareness that certain racial or nationality groups might be represented among the lawless is not probative of a discriminatory congressional motive; intent, as noted above, requires more than knowledge of consequences. *See Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296. Certainly the actual statements of legislators cited by the appellants reflect only an attempt to comprehend and respond decisively to a perceived national crisis. To do so necessarily requires an understanding of the demographics and economics of the drug trade sought to be cur-

tailed. As the Eighth Circuit determined in *United States v. Clary*, there is no circumstantial evidence of discriminatory congressional purpose, and the 1986 Act is readily explainable as a reaction to "a unique and unprecedented problem for American narcotics enforcement." *See Clary*, 34 F.3d at 714. *See also, e.g., United States v. Chandler*, 996 F.2d 917, 918 (7th Cir.1993); *United States v. Galloway*, 951 F.2d 64, 65–66 (5th Cir.1992). We therefore reject appellants' argument that a racially discriminatory purpose can be attributed to Congress here.

■ Lacking persuasive evidence of discriminatory congressional purpose beyond the bare statistical impact of the guidelines, appellants argue alternatively that under *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), the racially disparate impact of a legislative enactment—where particularly dramatic—can be used without more to infer discriminatory intent on the part of the decisionmaker.[2] Those cases are not controlling, however, because here the legislative scheme and resulting disparate impact can be readily and logically explained on grounds other than discriminatory purpose. *Gomillion* and *Yick Wo* stand for the proposition that disparate racial impact may be thought dispositive or highly probative of discriminatory purpose without other evidence only where there exists a clear pattern of starkly disparate impact *"unexplainable on grounds other than race."* *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564 (emphasis added). Here, one need only look to the congressional findings

as to the seriousness of the crack cocaine problem to find such a race-neutral explanation. As evident from our analysis in *United States v. Cyrus* and *Thompson*, Congress acted in light of the distributional efficiencies, heightened potency and acute violence associated with crack cocaine. The crack/powder distinction in the statute is thus readily explained on grounds other than race. *See United States v. Cyrus*, 890 F.2d 1245, 1248 (D.C.Cir.1989); *Thompson*, 27 F.3d at 678–79. And, as noted above, appellants have not even demonstrated that impermissible considerations accompanied these race-neutral motivations.

\*   \*   \*   \*   \*   \*

■ Accordingly, we reject appellants' constitutional arguments that the 1986 Act and the federal Sentencing Guidelines impermissibly distinguish between criminal acts involving powder cocaine and those involving crack cocaine.[3] The convictions and sentences below are

*Affirmed.*

---

**2.** One should bear in mind, as we said in *Thompson*, that the legislation may actually disproportionately *benefit* African–Americans who live in areas plagued with crack distribution and use. *See Thompson*, 27 F.3d at 678 n. 3.

**3.** Appellant Johnson also challenges his conviction on the grounds of sufficiency of the evidence and admission of evidence of a past drug transaction as probative of intent to possess and distribute cocaine in the charged offense. The sufficiency of the evidence here cannot be seriously challenged. *See United States v. Rogers*, 918 F.2d 207, 213 (D.C.Cir.1990). Appellant's prejudice arguments are similarly unavailing in light of our past precedents, which clearly establish the probative value of evidence of past acts to establish present intent or other elements of a crime, pro-

bative value outweighing any possible prejudice. *See, e.g., United States v. Washington*, 969 F.2d 1073, 1080–81 (D.C.Cir.1992), *cert. denied, Washington v. United States*, —— U.S. ——, 113 S.Ct. 1287, 122 L.Ed.2d 679 (1993).

That Johnson had conceded the element of intent to distribute and chose only to dispute the possession element of the charged offense does not render the past bad act evidence prejudicial. Not only was the evidence probative of intent to possess (as distinct from intent to distribute), but also the government may still introduce evidence to establish each of the elements of an offense, even those elements tactically ceded by a defendant. *See Estelle v. McGuire*, 502 U.S. 62, ——, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991).