SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Brandon M. Washington (A-29-22) (087477)**

**Argued September 26, 2023 -- Decided January 8, 2024**

**RABNER, C.J., writing for a unanimous Court.**

In this appeal, the Court considers whether the safeguards relating to eyewitness identification evidence set forth in State v. Henderson, 208 N.J. 208 (2011), should apply when lawyers meet with witnesses to prepare for trial.

Defendant Brandon Washington was forcibly removed from a "Ladies Night" event after an argument with a security guard. Seconds later, someone fired shots into the event venue, striking two people. After an investigation, defendant was charged with two counts of attempted murder.

During the initial investigation, several witnesses selected defendant's picture from a photo array. Later, during trial preparation, an assistant prosecutor showed witnesses the array they had seen before or a single photo of defendant from Facebook. The witnesses later identified defendant in court. One did so for the first time at trial.

Through questioning at trial, it emerged that the witnesses had been shown photographs of defendant. Defense counsel requested a Rule 104 hearing to develop a record as to what was shown to witnesses during trial preparation. The court held a hearing only as to a single witness whose name had not been included on the State's witness list, and the court declined to expand that hearing beyond whether the witness should be permitted to testify.

The jury convicted defendant of a lesser included offense -- attempted passion provocation manslaughter -- on both counts. Defendant appealed, and the Appellate Division affirmed his conviction. The Court granted defendant's petition for certification "limited to the issues concerning the prosecutor showing witnesses photos of defendant during pretrial preparations." 253 N.J. 186, 186-87 (2023).

**HELD:** Finding no reason to treat impermissibly suggestive events during trial preparation differently from other suggestive identification procedures, the Court extends the relevant principles in Henderson to trial preparation sessions. Witnesses

1

who have made a prior identification should not be shown photos of the defendant during trial preparation -- neither new photos of the defendant for the first time nor, absent good reason, the same photos they previously reviewed. If a party can demonstrate a good reason to show witnesses a photo of the defendant they previously identified, the party must prepare and disclose a written record of what occurred. If, however, a witness has not previously identified a suspect, investigators can conduct an identification procedure during pretrial preparation in accordance with Henderson. A record of the procedure should be created and disclosed under Rule 3:11. Here, to determine the admissibility of the identification evidence, the Court remands to the trial court to conduct a hearing under United States v. Wade, 388 U.S. 218 (1967), and develop a more complete factual record.

1. Suggestive identification procedures may so irreparably taint out-of-court and in-court identifications that a defendant is denied due process. Henderson, 208 N.J. at 285. It is the likelihood of misidentification which violates a defendant's right to due process. Those due process concerns logically apply to suggestive identification procedures that take place early in an investigation as well as later on during trial preparation. The Court therefore considers whether the principles of Henderson extend to pretrial preparation. The Court observed in Henderson "that the possibility of mistaken identification is real" and "that eyewitness misidentification is the leading cause of wrongful convictions across the country." Id. at 218. The opinion identified a series of variables and their possible effect on the reliability of identification evidence. Id. at 248-72. Among other factors, Henderson addressed the effect of multiple viewings of a suspect, the use of showups, confirmatory feedback, blind administration, and memory decay. (pp. 16-18)

2. Multiple viewings of mugshots "can create a risk of 'mugshot exposure' and 'mugshot commitment.'" Id. at 255. Mugshot exposure occurs "when a witness initially views a set of photos and makes no identification, but then selects someone -- who had been depicted in the earlier photos -- at a later identification procedure." Ibid. Of greater significance for this case, mugshot commitment takes place when a witness identifies a single photo that is later included in a lineup. Id. at 256. In both instances, studies show that witnesses are affected by repeated viewings of a suspect. Mugshot commitment and exposure thus "can affect the reliability of [a] witness' ultimate identification and create a greater risk of misidentification." Ibid. As a result, the Court observed that "law enforcement officials should attempt to shield witnesses from viewing suspects or fillers more than once." Ibid. Showups are highly suggestive because the victim can only choose from one person. Although showups can serve a valuable purpose if conducted within hours of a crime, studies underscore the heightened risk of misidentification when a showup is conducted more than two hours after an event. Confirmatory feedback occurs when law enforcement officials "signal to eyewitnesses that they correctly identified the suspect." Id. at 253. According to social science research, "[c]onfirmatory feedback

2

can distort memory." Id. at 254. Concerns about feedback also relate to the person administering the identification procedure. Ideally, the administrator should "not know who the suspect is," or not know where the suspect appears in a lineup or photo array, to avoid influencing the witness intentionally or unintentionally. Id. at 248-49. That concept is referred to as "blind administration." Id. at 248. Henderson also made note of a straightforward principle -- that "[m]emories fade with time." Id. at 267. "[T]he more time that passes, the greater the possibility that a witness's memory of a perpetrator will weaken." Ibid. (pp. 18-22)

3. There is limited case law about witnesses being shown photos of defendants during trial preparation. Two decisions from New Jersey courts have referred to the display of photos during pretrial preparation sessions, but only in passing, and the Court reviews the handful of cases from other jurisdictions that have more squarely addressed the display of photos during trial preparation. (pp. 22-29)

4. Against the background of Henderson and persuasive case law, the Court finds no reason to treat impermissibly suggestive identification events during pretrial preparation differently than other identification procedures. That conclusion has practical consequences. First, as a general, overarching rule, witnesses who have already made an identification should not be shown any photos of the defendant during trial preparation. Second, when a witness has not previously been asked to make an identification, or has tried before but could not identify a suspect, investigators who are not familiar with the suspect's appearance can conduct an identification procedure at the time of trial preparation. The procedure should be done in a manner consistent with the Court's guidance in Henderson. It should also be recorded pursuant to Rule 3:11 and disclosed to defense counsel under Rule 3:13-3(b)(1)(J). Counsel may then request a Wade hearing. Henderson, 208 N.J. at 288. Defendants who can "show[] some evidence of suggestiveness that could lead to a mistaken identification" will be entitled to a pretrial hearing. Ibid. Today's ruling and guidance apply to this and future cases only. (pp. 30-33)

5. The Attorney General argues that photographs should generally not be shown "during trial preparation unless there is a good reason to do so." The Court does not rule out the possibility that there may be compelling reasons in certain cases to show witnesses photos they previously selected. But the Court does not view the examples cited by the Attorney General to rise to that level. (pp. 33-35)

6. The Court provides guidance about how to balance the State's important responsibility to prepare witnesses with the need to avoid unduly suggestive identification procedures. For example, prosecutors can ask witnesses about past identifications -- without confirming that the witness identified the defendant in the earlier identification -- or make video recordings of the identification procedure and then attempt to authenticate the video. If requested by a party, trial judges can

instruct the jury that court procedures caution against showing witnesses photos they have previously selected. The Court asks the Model Jury Charge Committee to develop an appropriate charge on that topic, as well as a general model charge on witness pretrial preparation. Although the Court cautions against it, if prosecutors or investigators show witnesses the same or new photos of a defendant during trial preparation, under the belief there is good reason to do so, they must create a contemporaneous, written record of what occurred and disclose it to the defense. The Court does not require an electronic recording to be made when a witness who previously made an identification is shown the same or new photos of a defendant. However, when an identification procedure is conducted during trial preparation with a witness who did not previously make an identification, the procedure should be recorded electronically consistent with Rule 3:11. The Court asks the Criminal Practice Committee to revise Rule 3:11 to comport with the principles announced in this decision. Based on what occurred during trial preparation, defendants may seek a pretrial hearing to determine whether a witness's identification evidence will be admitted at trial. Practices during trial preparation that run afoul of the Court's guidance in this decision would weigh against admitting the evidence. (pp. 35-38)

7. The trial preparation sessions at issue in this case did not accord with the principles set forth in today's decision because the State showed photos of defendant to witnesses during trial preparation and did not disclose that information at the time. Without knowing what took place, defense counsel was not in a position to ask for a Wade hearing prior to trial. On two occasions, defense counsel asked for a testimonial hearing in the middle of trial, but the trial court declined to conduct the full hearings sought. Because it is not entirely clear from the record who saw which photos, and when they saw them, the Court remands to the trial court to develop a factual record and conduct a Wade hearing. Based on the outcome of the hearing, the trial court should determine, witness by witness, whether the testimony should have been admitted and whether a new trial is warranted. The Court offers no view on the outcome of the hearing. If the court decides that a new trial is required, defendant's conviction should be vacated and a new trial date set. (pp. 38-40)

　　　**REMANDED to the trial court.**

**JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in CHIEF JUSTICE RABNER's opinion.**

4

SUPREME COURT OF NEW JERSEY

A-29 September Term 2022

087477

State of New Jersey,

Plaintiff-Respondent,

v.

Brandon M. Washington,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

Argued
September 26, 2023

Decided
January 8, 2024

Robin Kay Lord argued the cause for appellant (Law
Offices of Robin Kay Lord, attorneys; Robin Kay Lord
and Monika Mastellone, on the briefs).

Nicole Handy, Assistant Prosecutor, argued the cause for
respondent (LaChia L. Bradshaw, Burlington County
Prosecutor, attorney; Nicole Handy, of counsel and on
the briefs).

Stefan Van Jura, Assistant Deputy Public Defender,
argued the cause for amicus curiae Public Defender of
New Jersey (Joseph E. Krakora, Public Defender,
attorney; Stefan Van Jura, of counsel and on the brief).

Adam D. Klein, Deputy Attorney General, argued the
cause for amicus curiae Attorney General of New Jersey
(Matthew J. Platkin, Attorney General, attorney; Lauren

Bonfiglio, Deputy Attorney General, of counsel and on the brief).

Ian S. Marx argued the cause for amici curiae American Civil Liberties Union of New Jersey and The Innocence Project (Greenberg Traurig, American Civil Liberties Union of New Jersey Foundation, and The Innocence Project, Inc., attorneys; Ian S. Marx, Karen Thompson, Alexander Shalom, Caroline J. Heller (Greenberg Traurig) of the New York bar, admitted pro hac vice, Elliot H. Scherker and Brigid F. Cech Samole (Greenberg Traurig) of the Florida bar, admitted pro hac vice, Kara E. Angeletti (Greenberg Traurig) of the Illinois bar, admitted pro hac vice, Maxwell C. Fabricant (The Innocence Project, Inc.) of the New York bar, admitted pro hac vice, and Anton Robinson (The Innocence Project, Inc.) of the New York and Florida bars, admitted pro hac vice, on the brief).

CJ Griffin submitted a brief on behalf of amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; CJ Griffin, on the brief).

Emeka Nkwuo submitted a brief on behalf of amicus curiae New Jersey Association for Justice (Lomurro, Munson, Comer, Brown & Schottland, attorneys; Emeka Nkwuo, of counsel and on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

In this appeal, we consider whether certain safeguards relating to eyewitness identification evidence should apply when lawyers meet with witnesses to prepare for trial.

2

It is well-settled that suggestive identification procedures can distort a witness's memory and lead to misidentifications. State v. Henderson, 208 N.J. 208, 218 (2011). In Henderson, the Court reviewed a series of variables that can affect the reliability of identification evidence. Id. at 248-72. The opinion did so in the context of the investigative phase of a criminal case.

Certain suggestive practices, however -- like showing a witness a photo of a suspect multiple times, showing the witness only a single photo of a suspect, or offering confirmatory feedback -- can lead to unreliable and mistaken identifications whether they are done early in an investigation or later on during trial preparation. Other variables including memory decay relate to later events as well. Because we see no reason to treat impermissibly suggestive events during trial preparation differently from other suggestive identification procedures, we extend the relevant principles in Henderson to trial preparation sessions.

As a result, we hold that witnesses who have made a prior identification should not be shown photos of the defendant during trial preparation -- neither new photos of the defendant for the first time nor, absent good reason, the same photos they previously reviewed. As is true during an investigation, both practices have the potential to distort a witness's memory of the actual events and undermine the reliability of a later identification.

3

If a party can demonstrate a good reason to show witnesses a photo of the defendant they previously identified, the party must prepare and disclose a written record of what occurred. Although we are not persuaded the examples the State has offered to date can qualify as good reasons, we do not rule out that possibility altogether.

If, however, a witness has not previously identified a suspect, investigators can conduct an identification procedure during pretrial preparation in accordance with Henderson. A record of the procedure should be created and disclosed under Rule 3:11.

The central question in this trial for attempted murder was the identity of the shooter. During trial preparation, the prosecution showed certain witnesses the photo array they had previously viewed with defendant's picture in it; others were shown a single photo of defendant. No contemporaneous record was made in either situation. Afterward, multiple witnesses identified defendant at trial.

Because it is not entirely clear from the record which witnesses saw which photos and when they saw them, and because no hearings were held under United States v. Wade, 388 U.S. 218 (1967), to determine the admissibility of the identification evidence, we remand to the trial court to conduct a hearing and develop a more complete factual record. Based on the

4

outcome of the hearing, the court should determine whether each witness's testimony should have been admitted and whether a new trial is warranted.

I.

We draw the following facts from the record of defendant's trial.

A.

The Veterans of Foreign Wars (VFW) lodge in Willingboro hosted a "Ladies Night" event on February 16, 2017. About 150 people attended. Before they could enter the hall, they had to sign in, show identification, and submit to a security check.

Mark Peterson worked at the front desk that evening and recalled that defendant Brandon Washington entered the hall between 9:30 and 10:00 p.m. Two hours later, a security guard, William Matthews, approached defendant as he leaned against a wall and blocked the entrance to the bar area. Matthews recognized defendant because he had seen him at the VFW hall four or five times before. Matthews asked him to move. Defendant responded, "back the f--- up off of me."

The bar manager, Timothy Scott III, saw the interaction, approached defendant, and asked if he could speak with him. Defendant responded, "I ain't going no f------ where" and chest bumped Scott III. Matthews then

placed defendant in a chokehold, maneuvered him out the front door, and reentered the hall.

Seconds later, the front door swung open. Someone stood in the doorway, pointed a gun into the hall, and started shooting. One bullet struck Matthews near his ear. He fell backwards and knocked Peterson down in the process. Another bullet struck Peterson in the arm. After firing three or four times, the shooter ran out through the front door.

The police arrived within minutes and rendered first aid to Matthews and Peterson. Scott III showed an officer a photo he had on his cell phone of defendant and a second person. Scott III said he received the photo from Victoria Hendrix, who tended bar that evening and received the photo from another employee. Scott III also relayed that he had shown the photo to his father, Timothy Scott Jr., who worked the sign-in desk that night.

On May 25, 2017, a grand jury in Burlington County returned an indictment that charged defendant with two counts of attempted murder. After multiple adjournments, defendant's trial began on February 7, 2019. Defendant did not move for a hearing to challenge any out-of-court identifications before the start of trial.

6

B.

This appeal centers around photos of defendant that witnesses viewed during pretrial preparation. Our focus, as a result, is on the identification evidence in the case.

During the initial investigation, several witnesses selected defendant's picture from a photo array. Later, during trial preparation, an assistant prosecutor showed witnesses the array they had seen before or a single photo of defendant from Facebook. The single photo depicted defendant wearing an "Evel Knievel" jacket with red, white, and blue sleeves, and a pair of glasses.[1] The witnesses later identified defendant in court. One did so for the first time at trial.

For example, Peterson, who worked at the front desk, testified that he saw defendant being removed from the hall and then watched him pull a gun and fire into the building. Hours later, while being treated at the hospital for a bullet wound, Peterson identified defendant's picture from an array of six photographs. Peterson also testified that he had seen defendant at the VFW hall before.

---

[1] Certain witnesses also viewed a different Facebook photo on the night of the shooting. As noted earlier, witnesses shared the photo among themselves shortly after the shooting. The photo depicted defendant wearing a white jacket and white slacks; a second individual is depicted beside him.

On cross-examination, Peterson said he met with the assistant prosecutor about five times before trial. On one or two of those occasions, he reviewed the photo array again. Peterson later identified defendant at trial.

Matthews, the security guard, testified that he had seen defendant at the hall four or five times before, roughly once every two months. Matthews said defendant wore either a "black furry jacket" or a red, white, and blue jacket "like . . . Evel Knievel" to the hall the night of the shooting -- the jackets he had worn before. Matthews did not identify defendant prior to trial or during direct-, cross-, or redirect-examination.

Immediately before cross-examination, defense counsel asked for a Rule 104 "hearing with witnesses" to determine "what happened during the pretrial prep of this witness." Counsel explained that in Matthews' initial statement to the police, he mentioned a "blue, red and white . . . sweat jacket . . . hoodie type style," but not a black fur coat. Counsel argued the defense was entitled to know what, if any, photographs had been shown to the witness during trial preparation.

In response, the assistant prosecutor represented that after Matthews described the red, white, and blue jacket at a pretrial meeting, he showed Matthews the Facebook photo of defendant "wearing the jacket." The

8

prosecutor added, "[w]e didn't ask him" to identify the person in the photo because "[h]e cannot identify the person who shot him."

Defense counsel then reiterated her request for a hearing to develop "a record as to what was shown" to the witness. Counsel argued that "[w]hen an eyewitness is prepped by a prosecut[or]," and a photo identification is conducted, the State is required to disclose the details of what took place. She specifically asked to question Detective Brian Miller, who was present for the prep session. The trial court declined to conduct a hearing and instead directed the prosecution to identify which photos it had shown the witness.

On cross-examination, Matthews said he had met with the prosecution team three times before trial. When confronted with the Facebook photo of defendant wearing a red, white, and blue jacket, he stated, "I didn't see that picture" and "I don't recall seeing that picture." In front of the jury, the prosecution stipulated that it had shown Matthews the photo.

During re-cross examination, Matthews identified defendant as the shooter for the first time. He stated, "I'm looking at him closely, clearly now. That's the man that shot me right there, ma'am." He said he had not identified defendant before "[b]ecause that question never came up."

Scott III, the bar manager, also testified. Beforehand, defense counsel moved to prevent him from testifying because his name was not on the State's

9

witness list. The State maintained the omission was an oversight and emphasized that Scott III's name was mentioned throughout the discovery it had provided the defense.

The trial court conducted a Rule 104 hearing mid-trial. During the hearing, Scott III testified about what he observed and what he did on the night of the shooting. Among other things, he identified a Facebook photo of defendant wearing white that Scott III saw right after the shooting. He also identified defendant, who was present in court, as the shooter.

Defendant then argued that Scott III should not be allowed to testify at trial on account of surprise and because of the taint from his having seen the Facebook photo. Counsel specifically sought to prevent Scott III from offering any identification evidence at trial. Counsel also asked to question Hendrix, who sent the Facebook photo to Scott III.

The trial court declined to broaden the scope of the hearing. Although the court noted "this is not a Wade hearing" "in the traditional sense," it reviewed certain relevant factors under the case law. In particular, the court found that Scott III "had sufficient opportunity to view the incident," "his degree of attention . . . was exceptional," and he had a high level of certainty about the identification. The court concluded he could testify before the jury.

Scott III told the jury he saw defendant enter the bar and interacted with him. More than an hour later, he tried to diffuse the situation between Matthews and defendant and ultimately told defendant he had to leave. After Matthews removed defendant, Scott III saw him return and point a gun in his -- Scott III's -- direction.

Before the police arrived, Scott III said he saw the Facebook photo of defendant dressed in white and recognized him as the shooter. He later showed the photo to his father and the police.

Scott III met with the prosecutor about three times to prepare for trial. He was shown a single photo of defendant at the time, but it is unclear which photo he viewed. At trial, Scott III identified defendant in court and said he had no doubt defendant was the shooter.

Scott Jr., who worked at the sign-in desk, testified that he saw defendant enter the hall. He later told Matthews to ask defendant to move and then watched the ensuing confrontation among defendant, Matthews, and Scott III. Soon after defendant was taken out of the hall, Scott Jr. heard shots but did not see who fired them.

Scott Jr. testified that someone showed him a photo of "the shooter" at the bar, and he glanced at it. He could not recall what it looked like. Hours later, the police showed him an array of six photos, and he identified defendant

11

as the shooter. During trial preparation, the prosecutor showed Scott Jr. the same array he had viewed before. At trial, Scott Jr. identified defendant as the shooter.

Victoria Hendrix, a bartender at the hall, testified that she saw Scott III confront defendant and watched him get thrown out of the hall. "He came right back," according to Hendrix, and "open[ed] fire." She testified he had been at the bar before "enough times to remember who he was."

Hendrix said that she did not recall receiving, viewing, or sending the Facebook photo of defendant dressed in white on the night of the shooting. She identified him from a photo array hours after the shooting.

Hendrix spoke with the prosecutor twice prior to trial. She did not recall whether she was shown photos of defendant during those meetings.

When asked to identify the shooter at trial, she first said she did not see him in the courtroom. Soon after, the prosecutor showed Hendrix the photo array she had previously viewed. She examined each picture and confirmed that the shooter was depicted in the photo of defendant she had previously selected. Immediately afterward, on her own, she said she "wanted to go back to the question" whether she saw "the suspect in this room." She then identified defendant. Hendrix explained that she could not do so earlier

12

because "[h]e looks different today; "[h]e has a full head of hair today," unlike before, and "[h]is beard is gone."

Among other evidence at trial, the State introduced a pair of non-prescription Chanel glasses, with a black frame, found on a table near the doorway to the bar. The State Police laboratory tested a small amount of DNA found on the glasses and found "a mixture of DNA profiles consistent with at least two contributors." Defendant was "identified as the source of the major DNA profile obtained." "[N]o comparisons could be made to" the minor profile.

C.

The jury convicted defendant of a lesser included offense -- attempted passion provocation manslaughter -- on both counts. The trial judge sentenced him to two consecutive terms of ten years' imprisonment, subject to an 85 percent period of parole ineligibility.

Defendant appealed, and the Appellate Division affirmed his conviction. Defendant raised seven issues, only one of which is relevant now: his challenge to "identification issues at trial."

The appellate court first addressed whether the circulation of defendant's Facebook photo among potential witnesses on the night of the shooting entitled him to a pretrial hearing. The court found, as to Scott III, that defendant

13

essentially was provided with a hearing under Wade and State v. Chen, 208 N.J. 307 (2011), and did not request a hearing for the other witnesses. In addition, the court noted that defendant could not meet the threshold showing for a hearing under Chen -- that the witnesses viewed the photo under "highly suggestive circumstances." See 208 N.J. at 327.

Next, the Appellate Division considered the identification claim before this Court -- that the prosecutor's pretrial preparation sessions with witnesses tainted their in-court identifications. The court rejected the claim as to Matthews, who identified defendant at trial in response to a question from defense counsel. The court observed that "the argument has some merit" as to the other witnesses but chose "not to decide whether . . . showing a photograph of defendant or a photographic array that included a previously identified photo of defendant must be recorded pursuant to Rule 3:11(a)." The Appellate Division noted that defendant did not seek a hearing and failed "to create a more expansive, detailed record in this case."[2]

The Appellate Division denied defendant's motion for reconsideration.

---

[2] The Appellate Division remanded to the trial court to consider the overall fairness of defendant's consecutive sentences on multiple offenses, pursuant to State v. Torres, 246 N.J. 246, 268 (2021). Today's opinion does not affect that determination.

14

We granted defendant's petition for certification "limited to the issues concerning the prosecutor showing witnesses photos of defendant during pretrial preparations." 253 N.J. 186, 186-87 (2023). We also granted leave to appear as friends of the court to the Attorney General, the Public Defender, the New Jersey Association for Justice (NJAJ), the Association of Criminal Defense Lawyers of New Jersey (ACDL), and the Innocence Project and American Civil Liberties Union of New Jersey (ACLU), who submitted a joint brief.

## II.

Defendant argues that the prosecutor's conduct during pretrial preparation sessions violated his due process rights and warrants a new trial. Defendant contends that showing witnesses photos of a defendant years after an offense unreasonably risks altering a witness's memory and should be barred. When there is an extraordinary need to show a defendant's photo during a preparation session, defendant submits the process should be electronically recorded.

The Public Defender, NJAJ, ACDL, and the Innocence Project and ACLU support defendant's position. In general, they submit that using a defendant's photograph during trial preparation is inherently suggestive and should be prohibited. The NJAJ adds that any display of a defendant's

15

photograph during pretrial preparation should be conducted in accordance with the procedural safeguards of Henderson and the requirements of Rule 3:11.

The State argues that the Appellate Division properly concluded the record is inadequate to decide whether defendant was prejudiced by some witnesses viewing defendant's photo during trial preparation. In any event, the State submits that the display of the photos does not warrant reversal. In addition, the State contends that witness preparation sessions in which a photo of a defendant is shown need not be recorded under Rule 3:11.

The Attorney General as amicus submits that "prosecutors should generally avoid showing witnesses previously identified photographs of defendants during trial preparation without a good reason to do so." In this case, however, the Attorney General submits that the trial preparation sessions did not taint the witnesses' in-court identifications of defendant. The Attorney General also maintains the prosecutor was not required to record the witnesses' trial preparation sessions.

### III.

Suggestive identification "procedures may 'so irreparably "taint[]" . . . out-of-court and in-court identifications' that a defendant is denied due process." Henderson, 208 N.J. at 285 (alteration in original) (quoting State v. Madison, 109 N.J. 223, 239 (1998)). "It is the likelihood of misidentification

16

which violates a defendant's right to due process . . . ." Neil v. Biggers, 409 U.S. 188, 198 (1972). Those due process concerns logically apply to suggestive identification procedures that take place early in an investigation as well as later on during trial preparation.

Here, the State showed photos of defendant to witnesses during trial preparation and did not disclose that information to the defense at the time. To assess that practice and the likelihood of misidentification it may present, we consider whether the principles of Henderson extend to pretrial preparation.

In Henderson, the Court evaluated various issues related to the admissibility of eyewitness identification evidence. Based on an extensive record developed before a Special Master, the Court observed "that the possibility of mistaken identification is real" and "that eyewitness misidentification is the leading cause of wrongful convictions across the country." 208 N.J. at 218.

Relying on scientific evidence presented at the hearing, the Court concluded "that memory is malleable, and that an array of variables can affect and dilute memory and lead to misidentifications." Ibid. The opinion identified a series of variables and their possible effect on the reliability of identification evidence. Id. at 248-72. Among other factors, Henderson addressed the effect of multiple viewings of a suspect, the use of showups,

17

confirmatory feedback, blind administration, and memory decay. Id. at 248-50, 253-56, 259-61, 267.

## A. Multiple Viewings

The Court in Henderson found that "[v]iewing a suspect more than once during an investigation can affect the reliability of the later identification." Id. at 255. As the Special Master concluded, "successive views of the same person can make it difficult to know whether the later identification stems from a memory of the original event or a memory of the earlier identification procedure." Ibid.

For example, multiple viewings of mugshots "can create a risk of 'mugshot exposure' and 'mugshot commitment.'" Ibid. Mugshot exposure occurs "when a witness initially views a set of photos and makes no identification, but then selects someone -- who had been depicted in the earlier photos -- at a later identification procedure." Ibid. Of greater significance for this case, mugshot commitment takes place when a witness identifies a single photo that is later included in a lineup. Id. at 256.

In both instances, studies show that witnesses are affected by repeated viewings of a suspect. A mistaken identification from an initial procedure is likely to be repeated when the same mistakenly identified suspect is included in the second procedure. For example, a composite study revealed that 15

18

percent of witnesses misidentified an innocent person they viewed in a lineup for the first time, yet 37 percent did so when they "had seen the innocent person in a prior mugshot." Id. at 255-56 (citing Kenneth A. Deffenbacher et al., Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference, 30 Law & Hum. Behav. 287, 299 (2006)).

Other "[s]tudies have shown that [when] witnesses identify an innocent person from a mugshot, 'a significant number' then 'reaffirm[] their false identification' in a later lineup -- even if the actual target is present." Id. at 256 (third alteration in original) (citing Gunter Koehnken et al., Forensic Applications of Line-Up Research, in Psychological Issues in Eyewitness Identification 205, 219 (Siegfried L. Sporer et al. eds., 1996)). In short, "repeated procedures make certain that the suspect is identified more often, but do not increase the likelihood that the identified suspect is actually guilty." Nancy K. Steblay & Jennifer E. Dysart, Repeated Eyewitness Identification Procedures with the Same Suspect, 5 J. Applied Rsch. Memory & Cognition 284, 286 (2016).

Mugshot commitment and exposure thus "can affect the reliability of [a] witness' ultimate identification and create a greater risk of misidentification." Henderson, 208 N.J. at 256. As a result, the Court observed that "law

enforcement officials should attempt to shield witnesses from viewing suspects or fillers more than once." Ibid.

## B. Showups

"Showups are essentially single-person lineups" in which "a single suspect is presented to a witness to make an identification." Id. at 259. As we have observed several times, showups are highly suggestive "because the victim can only choose from one person." State v. Herrera, 187 N.J. 493, 504 (2006); see also State v. Watson, 254 N.J. 558, 579 (2023); Henderson, 208 N.J. at 261; Madison, 109 N.J. at 243.

Our case law recognizes that "[s]howups can serve a valuable purpose if conducted within hours of a crime." Watson, 254 N.J. at 579. But studies underscore the "heightened risk of misidentification" when a showup is "conducted more than two hours after an event." Id. at 579-80 (quoting Henderson, 208 N.J. at 261, and citing, for example, A. Daniel Yarmey et al., Accuracy of Eyewitness Identifications in Showups and Lineups, 20 Law & Hum. Behav. 459, 464 (1996)).

## C. Confirmatory Feedback and Blind Administration

Confirmatory feedback occurs when law enforcement officials "signal to eyewitnesses that they correctly identified the suspect." Henderson, 208 N.J. at 253. According to social science research, confirmatory feedback "can

reduce doubt," "engender a false sense of confidence," and "falsely enhance a witness' recollection of" their ability to view an event. Ibid. (discussing Amy Bradfield Douglass & Nancy Steblay, Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-identification Feedback Effect, 20 Applied Cognitive Psych. 859, 863-65 (2006)). "[T]hose effects can be lasting." Ibid. (citing Jeffrey S. Neuschatz et al., The Effects of Post-Identification Feedback and Age on Retrospective Eyewitness Memory, 19 Applied Cognitive Psych. 435, 449 (2005)).

In short, "[c]onfirmatory feedback can distort memory." Id. at 254. That is true for feedback from law enforcement officers as well as fellow witnesses and other private actors and sources. Id. at 255, 268; Chen, 208 N.J. at 310-11. In one study, one-third of students who watched an event and then read a description that contained false details incorporated the false details when they later described the suspect. Henderson, 208 N.J. at 268-69 (citing Elizabeth F. Loftus & Edith Greene, Warning: Even Memory for Faces May Be Contagious, 4 Law & Hum. Behav. 323, 328 (1980), among other studies).

Concerns about feedback also relate to the person administering the identification procedure. Ideally, the administrator should "not know who the suspect is," or not know where the suspect appears in a lineup or photo array, to avoid influencing the witness intentionally or unintentionally. Id. at 248-49.

21

That concept is referred to as "blind administration." Id. at 248. Of course, when a prosecutor or investigator assigned to a case is involved in an identification procedure during trial preparation, blind administration is not possible.

## D. Memory Decay

The Court in Henderson also made note of a straightforward principle -- that "[m]emories fade with time." Id. at 267. "[T]he more time that passes, the greater the possibility that a witness's memory of a perpetrator will weaken." Ibid. (citing Kenneth A. Deffenbacher et al., Forgetting the Once-Seen Face: Estimating the Strength of an Eyewitness's Memory Representation, 14 J. Experimental Psych.: Applied 139, 142 (2008); Carol Krafka & Steven Penrod, Reinstatement of Context in a Field Experiment on Eyewitness Identification, 49 J. Personality & Soc. Psych. 58, 65 (1985)).

## IV.

There is limited case law about witnesses being shown photos of defendants during trial preparation.

## A.

Two decisions from New Jersey courts have referred to the display of photos during pretrial preparation sessions, but only in passing. State v. Guerino involved an armed robbery in which an employee was injured. 464

N.J. Super. 589, 595 (App. Div. 2020). The case largely hinged on the identification of the robber. Ibid. Shortly after the robbery, the employee identified the defendant from a photo array. Id. at 599. About twenty months later, and two weeks before trial, a member of the prosecution team asked the victim to come to the courthouse. Id. at 600. She sat outside a courtroom with a detective and "observed a line of six or seven inmates walking in the corridor." Id. at 601. The victim "recognized one of the inmates" -- the defendant -- "as the robber." Ibid.

Following the defendant's conviction, the Appellate Division "remand[ed] the case for the trial court to convene a Wade-Henderson hearing to more closely examine the circumstances and impact of the unusual live lineup conducted in a courthouse corridor." Id. at 596-97. In its discussion of the identification, the court distinguished "the hallway event" -- which it found "was essentially a new identification procedure" -- from trial preparation. Id. at 615. The court observed, "this was not a situation where the prosecutor met with the victim shortly before trial to refresh her recollection of her prior statements and the selection she made and confidence level she expressed during the photo array procedure." Ibid.

Last term in Watson, this Court held "that first-time in-court identifications may only be conducted when there is good reason for them"

23

because of "[t]he inherently suggestive nature of the procedure." 254 N.J. at 568; see also State v. Burney, 255 N.J. 1, 26 (2023). In addition, the Court directed that "prosecutors must disclose in writing anything discussed with a witness during trial preparation that relates to an upcoming in-court identification." Watson, 254 N.J. at 588. By way of example, the opinion added that "if witnesses during trial preparation are shown photos they had previously viewed at prior out-of-court identifications, that must be disclosed as well." Ibid. (citing Henderson 208 N.J. at 255-56 (discussing multiple viewings of a suspect)). Watson did not consider the issue further.

B.

A handful of cases from other jurisdictions have more squarely addressed the display of photos during trial preparation.

The New York Court of Appeals thoughtfully considered the issue in People v. Marshall, 45 N.E.3d 954 (N.Y. 2015). In that appeal, the Court expressly rejected a "trial-preparation exception." Id. at 961-62.

The case arose out of an assault on a city bus. Id. at 957. Two months after the incident, the victim told police she saw the defendant at a hospital and recognized her. Ibid. Another sixteen months later, the prosecutor showed the victim an arrest photo of the defendant. Ibid.

24

At a court hearing the next day, the prosecutor told the court and defense counsel that he had shown the photo "as part of trial preparation" to help him better understand the victim's description of the defendant's hairstyle. Ibid. The defendant, in turn, asked for a Wade hearing. Ibid. The court denied a request to call the assistant district attorney but heard testimony from the victim. Ibid. She said she had only glanced at the blurry photo; on cross-examination, she said she had not seen it. Id. at 957-58. The victim later identified the defendant at a bench trial. Id. at 958. She was convicted of attempted assault and related offenses. Id. at 959.

The Court of Appeals rejected the argument that because the photo had been displayed as part of trial preparation, the defendant could not challenge the procedure under state law. Id. at 961-62 (citing N.Y. Crim. Proc. § 710.30). As the Court explained,

> [t]he concern that a pretrial identification will result in witness error is the same regardless of the People's motive. Whether the procedure is intended to refresh or anchor the identification of defendant in the witness's memory before trial, or intended to assist the ADA in preparing the case, the relevant inquiry remains the same: was the observation of defendant unduly suggestive, rendering the subsequent identification unreliable.
>
> . . . .
>
> We can find no basis to maintain a distinction between viewings of a defendant's image in preparation for trial

25

and any other out-of-court identifications.  Both expose a witness to defendant's likeness, with the potential risk for undue suggestiveness.

[Id. at 962.]

A divided Court, however, found that the failure to conduct a full Wade hearing was harmless in light of the victim's prior identification of the defendant at the hospital.  Id. at 963 (majority opinion), 967 (Lippman, C.J., dissenting).

The D.C. Circuit has also wrestled with the subject on multiple occasions, some of which either preceded or did not consider scientific evidence related to eyewitness identification.  In United States v. Gambrill, decided in 1971, a rape victim selected two people out of a seven-person lineup conducted one week after the crime.  449 F.2d 1148, 1151 (D.C. Cir. 1971).  Police included both individuals charged with her rape in the lineup -- defendants Gambrill and Hunter.  Ibid.  The victim picked out Hunter and an individual "other than Gambrill as the two men who most 'reminded' her of her assailants."  Ibid.

Several months later, during a conference at the United States Attorney's office, a police officer showed the victim two colored photos of Gambrill and Hunter.  Ibid.  The Assistant U.S. Attorney "was otherwise engaged" when the photos were shown.  Id. at 1152.  The victim "couldn't be sure" either man had

26

raped her.  Id. at 1157.  Six months later, at a suppression hearing, she identified both men, sitting at counsel table, as her assailants.  Ibid.  Before testifying at trial two days later, the Assistant U.S. Attorney "showed her the two colored pictures again and she saw a photograph of a lineup which included both suspects."  Id. at 1157-58.  She identified both defendants at trial.

The D.C. Circuit found that showing the colored photos was impermissibly suggestive.  Id. at 1153.  The court observed that the victim "knew" the photos depicted the two men who had been charged in the case and were awaiting trial.  Ibid.  In addition, the victim was shown the photos while "present in the Assistant U.S. Attorney's office . . . to prepare for that trial."  Ibid.  Under the totality of the circumstances, the court could not find "that the identification procedures . . . used . . . were not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Id. at 1157; see also id. at 1153 (citing Simmons v. United States, 390 U.S. 377, 384 (1968)).[3]  The Circuit Court therefore reversed the defendants' convictions.  Id. at 1159.

_____

[3] Henderson revised the framework to obtain a pretrial hearing but not the ultimate burden on a defendant.  Defendants are now entitled to a hearing if they can "show[] some evidence of suggestiveness that could lead to a mistaken identification."  Henderson, 208 N.J. at 288.  Generally, that evidence must be tied to a system variable -- one within the State's control.

Four years later, in United States v. Marshall, the D.C. Circuit rejected a claim that it was improper for the government to show a victim a photo of the defendant "shortly before her in-court identification of him." 511 F.2d 1308, 1311 (D.C. Cir. 1975). With little additional analysis, the court observed "this was the same picture that the victim had previously selected when [the defendant] was initially identified by her." Ibid.

The Circuit returned to the issue in United States v. Thompson, 27 F.3d 671 (D.C. Cir. 1994). In that case, the court upheld a conviction in which police officers viewed the defendant's arrest photo during trial preparation. Id. at 672. Two undercover officers had purchased $20 of cocaine base from the defendant. Id. at 673. Minutes later, the officers drove past the defendant and one of the officers identified him. Ibid. Prior to trial, the government showed both officers the defendant's arrest photo while preparing them for their testimony. Ibid. One officer admitted on cross-examination that she was not shown any other photos; the other officer "was not asked for the surrounding details." Ibid. Both officers identified the defendant at trial. Ibid.

---

Id. at 288-89. "The State must then offer proof to show that the proffered eyewitness identification is reliable -- accounting for" variables within its control and others that are not. Id. at 289. Henderson did not alter the defendant's ultimate burden: "to prove a very substantial likelihood of irreparable misidentification." Ibid. (citing Manson v. Brathwaite, 432 U.S. 98, 116 (1977), citing, in turn, Simmons, 390 U.S. at 384).

Citing its prior ruling in Marshall, the court found nothing wrong with "showing . . . a witness a photograph to refresh her recollection." Ibid. It noted the "technique may well make [a] witness seem more confident when she identifies the defendant in court" but added that "the same can be said of every technique used to refresh a witness's recollection during pre-trial preparations." Ibid. In any event, the court observed that viewing the photo "carried no significant risk of causing any misidentification" in light of the officer's drive-by identification. Id. at 673-74.

More recently, the Court of Appeals for the District of Columbia reversed a conviction because of what occurred during pretrial preparation: the prosecutor showed the key witness, a police officer, a mugshot of the defendant on the eve of trial. Morales v. United States, 248 A.3d 161, 166-67 (D.C. 2021). The officer had "only fleetingly" seen the defendant four months earlier and had not made a prior identification. Ibid. The assistant "prosecutor explained that she 'was just preparing for trial.'" Id. at 174. The court found the procedure was "beyond suggestive," id. at 167, and that the in-court identification was unreliable, id. at 180.

V.

Against that background, we consider whether and how the principles discussed in Henderson apply to pretrial preparation sessions.

29

## A.

To be sure, <u>Henderson</u> did not directly address witness preparation sessions before trial. The case involved an allegedly suggestive identification procedure conducted two weeks after the offense had been committed. <u>Henderson</u>, 208 N.J. at 222-24.

As part of its analysis, the Court reviewed an extensive evidentiary record about how human memory works and how it can be affected and distorted by different variables. Nothing in the opinion or the record before the Court suggested that those principles applied only to the investigative phase of a criminal case. In fact, a number of variables, like memory decay, confirmatory feedback, and multiple viewings of a suspect, readily relate to later events.

Likewise, issues about human memory discussed in <u>Henderson</u> did not turn on why prosecutors or law enforcement officials conducted a particular identification procedure. <u>See</u> <u>Marshall</u>, 45 N.E.3d at 962; <u>Guerino</u>, 464 N.J. Super. at 615. The Court instead focused on how suggestive procedures can distort a witness's memory and result in unreliable identifications. And unduly suggestive procedures can lead to misidentifications and invoke due process concerns whether they are conducted in the initial stage of an investigation or during trial preparation sessions.

30

We therefore see no reason to treat impermissibly suggestive identification events during pretrial preparation differently than other identification procedures.  See Marshall, 45 N.E.3d at 962; see also Guerino, 464 N.J. Super. at 614-15.  That conclusion has practical consequences.

First, as a general, overarching rule, witnesses who have already made an identification should not be shown any photos of the defendant during trial preparation.

In most cases, witnesses who meet with prosecutors and investigators to prepare for trial have already identified or attempted to identify a suspect.  Many have previously viewed a photo array, a live lineup, or a showup.  Any witness who has made a prior identification should not be shown new or different photos of the defendant during prep sessions.  That applies to the display of a single photo of the defendant or groups of photos that include the defendant.

Showing a witness during trial preparation a photo of a single person which they have not seen before is like conducting a showup long after a crime.  It is tantamount to a new and suggestive identification procedure.  See Henderson, 208 N.J. at 255-56.  Showing an array of photos that includes a new photo of the defendant is likewise the equivalent of a new identification procedure with an important difference:  having seen a photo of the defendant

31

before, the repetition raises concerns about mugshot commitment. See ibid. Both scenarios can affect the reliability of the later identification. Id. at 256.

But it is not just new photos that raise concerns. Witnesses should not be shown the same photo or photos of a defendant they previously viewed when they prepare for trial. The Attorney General advises that "responses . . . from the County Prosecutor's Offices surveyed reflect that it is not common practice for prosecutors to show witnesses previously selected photographs of the defendant or the entire array in preparing for trial, but it does sometimes occur." To the extent the practice exists, it should not be continued.

For reasons discussed earlier, the act of showing and then reshowing a photo can affect and distort a person's memory. Showing a single photo multiple times presents a classic form of mugshot commitment. Id. at 256. The practice is disfavored because it is difficult to know whether a witness recalls the original event or the earlier identification procedure. Id. at 255. The practice can also enhance the risk that a witness will affirm an earlier mistaken identification. Id. at 255-56. The same is true when a witness is shown multiple photos -- a photo array, for example -- a second time. Ibid.

Reshowing photos to a witness can also pose risks associated with confirmatory feedback. When a witness is shown a photo or an array once again during trial preparation, the implicit message is clear: "That's the very

32

person you identified before."  The message can reduce doubt and create "a false sense of confidence" when the witness later testifies about the prior identification or is asked to identify the defendant at trial.  See id. at 253 (citing studies).

Second, when a witness has not previously been asked to make an identification, or has tried before but could not identify a suspect, investigators who are not familiar with the suspect's appearance can conduct an identification procedure at the time of trial preparation.  The procedure should be done in a manner consistent with the Court's guidance in Henderson.  It should also be recorded pursuant to Rule 3:11 and disclosed to defense counsel under Rule 3:13-3(b)(1)(J).

Counsel may then request a Wade hearing.  Henderson, 208 N.J. at 288.  Defendants who can "show[] some evidence of suggestiveness that could lead to a mistaken identification" will be entitled to a pretrial hearing.  Ibid.

We apply today's ruling and the above guidance to this and future cases only.

### B.

The Attorney General's position is similar in many respects.  It recognizes that "[p]rosecutors should not show a witness a photograph of the defendant for the first time during trial preparation . . . when that witness can

33

reasonably be expected to make a courtroom identification of the defendant." The Attorney General also argues that "[p]rosecutors should generally avoid showing witnesses previously selected photographs of the defendant during trial preparation unless there is a good reason to do so."

At oral argument, the Attorney General offered examples of what might qualify as a "good reason." We do not rule out the possibility that there may be compelling reasons in certain cases to show witnesses photos they previously selected. But we are not persuaded that the examples presented to date rise to that level.

The need to prepare for trial or refresh a witness's recollection, standing alone, cannot serve as a good reason. Because prosecutors must prepare witnesses for trial in every case, the exception would swallow the rule.

Similar concerns would arise if good reason were based on the amount of time that has passed between the offense and the start of trial. Because trials in criminal cases do not begin until many months, and often more than a year, after a crime takes place, this exception would also upend the rule. Beyond that, it could justify reshowing photos of the defendant to witnesses in complex cases like homicides, where the time interval is often lengthy and the stakes are the highest.

34

The Attorney General also suggested that photos could be shown again when a witness knows the suspect reasonably well.  But there is little need during trial preparation to show a witness a photo of a good friend, a relative, or a co-worker who is close to them.  And when a relationship is more attenuated -- for example, a customer who occasionally frequents a bar or a bank -- suggestive practices raise heightened concerns.

A witness's inability to recall on account of trauma, which has also been raised as a potential good reason, poses a more fundamental problem.  If witnesses cannot recall a suspect during trial preparation or otherwise, they should not be shown a photo of the person they previously selected to refresh their memory.  Under any measure, that would be unusually suggestive.

C.

We recognize that prosecutors have an important duty to adequately prepare for trial.  In re Segal, 130 N.J. 468, 480 (1992).  An unprepared witness who stumbles on the stand can lead to a miscarriage of justice.  With that in mind, we consider how to balance the State's important responsibility to prepare witnesses with the need to avoid unduly suggestive identification procedures.

One way is to remove just the suggestive aspects of identification evidence from trial preparation sessions.  In other words, prosecutors preparing

35

a witness for trial can address what happened months earlier -- when the witness was first asked to identify a suspect -- without showing any photos the witness previously reviewed or selected.

For example, prosecutors can ask witnesses whether they recall having been shown a series of photos, making an identification, and signing and dating a photo in an array. Witnesses can be asked how confident they were at the time. They can be advised that the prosecutor may show them photos at trial and ask if they can identify the suspect and confirm their signature. Such exchanges would need to be disclosed in writing to defense counsel. See Watson, 254 N.J. at 588.

In those and other ways, witnesses can be prepared without viewing any photos they previously saw. To be clear, prosecutors may not in any way confirm that the witness identified the defendant in the earlier identification.

Prosecutors and investigators also have the option to make a video recording of the initial identification procedure. The witness could testify about the prior identification and attempt to authenticate the video. See N.J.R.E. 803(a)(3) ("[A] prior identification of a person made after perceiving that person if made in circumstances precluding unfairness or unreliability" is "not excluded by the hearsay rule.").

36

If requested by a party, trial judges can instruct the jury that court procedures caution against showing witnesses photos they have previously selected. We note as well that New York has a general model charge on witness pretrial preparation. CJI2d [NY] Witness Pre-trial Preparation (accessible through the New York Courts portal, https://www.nycourts.gov/ judges/cji/1-General/cjigc.shtml). We ask the Model Jury Charge Committee to develop appropriate charges on both topics.

We add a final point. Although we caution against it, if prosecutors or investigators show witnesses the same or new photos of a defendant during trial preparation, under the belief there is good reason to do so, they must create a contemporaneous, written record of what occurred and disclose it to the defense. See R. 3:11; R. 3:13-3(b)(1)(J); see also State v. Anthony, 237 N.J. 213, 231, 233 (2019) (relying on the Court's supervisory powers to require that a record be made of identification procedures, now codified at Rule 3:11). The written record should identify the location of the meeting, who was present for it, and precisely which photos were shown to the witness. It should also describe the dialogue between the prosecution team and the witness, account for any non-verbal cues, and recount any statements the witness made after seeing the photos. See R. 3:11(c).

Historically, trial preparation sessions between counsel and witnesses have not been recorded by either side for various reasons. Consistent with that practice, we do not now require an electronic recording to be made of trial preparation sessions when a witness who previously made an identification is shown the same or new photos of a defendant. However, as noted earlier, when an identification procedure is conducted during trial preparation with a witness who did not previously make an identification, the procedure should be recorded electronically consistent with Rule 3:11. We ask the Criminal Practice Committee to revise Rule 3:11 to comport with the above principles.

Based on what occurred during trial preparation, defendants may seek a pretrial hearing to determine whether a witness's identification evidence will be admitted at trial. See Henderson, 208 N.J. at 288. Practices during trial preparation that run afoul of the above guidance would weigh against admitting the evidence.

## VI.

We now apply the above principles to the facts of this case. We note that the trial preparation sessions in question did not accord with the above principles in that the State showed photos of defendant to witnesses during trial preparation and did not disclose that information at the time.

Peterson, for example, identified defendant's picture from a photo array during the initial investigation. At one or two sessions with the prosecutor to prepare for trial, he was shown the array again. It appears from the record before us that the information was first revealed to the defense during Peterson's cross-examination.[4]

Matthews did not identify defendant before trial. Yet he was shown a single photo of defendant during trial preparation. At oral argument, the State confirmed the information was first disclosed in the middle of trial.

Scott III was shown a single photo of defendant during trial preparation, but it is not clear in the record which photo he saw or when the information was disclosed to the defense.

Scott Jr. identified defendant from a photo array shortly after the shooting. During trial preparation, he was shown the array once again. It appears that was first disclosed during his trial testimony.

Hendrix identified defendant from a photo array during the investigation. She could not recall whether she was shown photos of defendant during trial preparation.

---

[4] Because the record does not include copies of the discovery materials exchanged, we cannot be certain when the information discussed in this section was first disclosed.

We recognize that when this case went to trial in 2019, the assistant prosecutor did not have specific guidance about the use of photos during trial preparation and the disclosure requirements outlined above. But without knowing what took place, defense counsel was not in a position to ask for a Wade hearing prior to trial. On two occasions, defense counsel asked for a testimonial hearing in the middle of trial, but the trial court declined to conduct the full hearings sought.

Because it is not entirely clear from the record who saw which photos, and when they saw them, we remand to the trial court to develop a factual record and conduct a Wade hearing. Based on the outcome of the hearing, the trial court should determine, witness by witness, whether the testimony should have been admitted and whether a new trial is warranted. See Henderson, 208 N.J. at 300. We offer no view on the outcome of the hearing.

If the court decides that a new trial is required, defendant's conviction should be vacated and a new trial date set.

## VII.

For the reasons set forth above, we remand to the trial court for further proceedings consistent with this opinion.

40

JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in CHIEF JUSTICE RABNER's opinion.